UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WESTON & COMPANY, INC.,

    Plaintiff,

Case No. 08-10242

Honorable Nancy G. Edmunds

v.

VANAMATIC COMPANY,

    Defendant.
                              /

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [24]**

This diversity jurisdiction case involves a dispute over sales commission. It is now before the Court on Defendant Vanamatic Company ("Vanamatic")'s motion for summary judgment. For the reasons stated below, Defendant's motion is DENIED.

**I.  Facts**

Plaintiff Weston & Company, Inc. is an independent sales representative firm. It is owned and operated by its President, Gerard Weston. Defendant Vanamatic is a family-owned, Ohio corporation engaged in the business of fabricating and manufacturing parts for sale in the automotive and other industries.

**A.  Weston/Vanamatic Contractual Relationship**

The relationship between Plaintiff and Vanamatic began in approximately January 1985. Prior to that time, Vanamatic had an oral agreement with another sales representative firm, William B. Willis and Associates, Inc. ("Willis"). Vanamatic never had a written agreement with Willis. (Wiltsie Dep. at 70; Weston Dep. at 74.) Pursuant to the

Willis/Vanamatic oral agreement, Willis solicited orders for automotive parts manufactured by Vanamatic, and Vanamatic paid Willis a commission on sales he made on Vanamatic's behalf.  There is no evidence of any agreement between Willis and Vanamatic limiting or curtailing post-termination sales commissions to be paid to Willis.[1]

In January 1985, Weston entered into a written Sales Representation Agreement with Willis, allowing Weston to assume Willis's sales representation duties on behalf of Vanamatic.  Willis wanted someone to take over his business so he could retire.  (Weston Dep. at 71-72.)

The initial term of the Willis/Weston Agreement was for one year.  (Pl.'s Ex. A, 1/4/85 Sales Repr. Agree. at ¶ 8.)  As of January 1, 1985, Weston agreed to assume Willis's sales and servicing responsibilities owed to Vanamatic.  The parties acknowledged that Vanamatic would pay commissions directly to Willis.  Willis agreed that once commission payments were received from Vanamatic, it would then pay commissions owed Weston under the terms of the Willis/Weston Agreement.  (*Id.* at ¶¶ 2, 7.)  The commission payments were broken into two categories:  (1) commissions on Vanamatic business contracts and/or purchase orders in existence on January 1, 1985, as well as "reorders of existing contracts," "orders under open contracts or orders of existing parts with minor modifications" (*id.* at ¶¶ 4.A, 4.C); and (2) commissions on "new purchase orders, new contracts, and the like" secured by Weston after January 1, 1985 (*id.* at ¶¶ 4.B).  As to the second category, it was further agreed that Weston would be entitled to post-termination commission payments for the "initial term of the particular contract or purchase order

---

[1] James Wiltsie, Sr. and Willis are both deceased.  (Weston Dep. at 96.)

generated by Weston during the term of [the Willis/Weston] Agreement" but not if an initial purchase order or contract "is renewed or enlarged." (*Id.* at ¶ 4.D.)  Weston was to receive a lower commission on category one sales and a higher commission on category two sales. (*Id.* at ¶ 4; Weston Dep. at 125-34.)

Willis provided James Wiltsie, Sr., President of Vanamatic, with an executed copy of the Willis/Weston Agreement. (Pl.'s Ex. A, 3/8/85 letter.)  Vanamatic had no objection to Weston's taking over the Vanamatic sales representation duties for Willis or to Weston's obtaining commissions through Willis. (Weston Dep. at 133-34, 137-38.)

It is not disputed that between 1985 and 2007, Plaintiff Weston and Defendant Vanamatic had an oral sales representation agreement. (Wiltsie Dep. at 70; Weston Dep. at 17-18.)  Weston agreed to act as an independent manufacturer's sales representative on Vanamatic's behalf by soliciting, making, and expanding on sales of Vanamatic's products to existing and new customers, and Vanamatic agreed to pay Weston sales commissions on products sold to those existing and new customers. (Weston Dep. at 151-53.)   Weston, like Willis before him, worked with some of Vanamatic's automotive customers.  He was also successful in obtaining new customers for Vanamatic. (Weston Dep. at 80-84, 149-52, 230-31.)  The commission rate Weston received was originally 5%, but the parties agreed that this rate could be reduced by mutual agreement. (Weston Aff. at ¶ 4; Weston Dep. at 106-08.)

Weston estimates that, over the course of his 22-year relationship with Vanamatic, the business that he procured resulted in approximately $20 to $30 million in sales for Vanamatic. (Weston Dep. at 101.)  The vast majority of  products Weston sold for

Vanamatic were metal screw machine products that were used predominately for automotive engine and transmission applications. (Weston Dep. at 17.)

### B. Post-Termination Commissions

The primary dispute in this lawsuit is over post-termination commissions. Weston contends that, although he never discussed this with anyone from Vanamatic, it was his understanding when he entered into the oral sales representation agreement with Vanamatic that he was entitled to post-termination commissions and, more specifically, commissions "for the life of the part." As support, Weston testified that Willis told him that this was so. (Weston Dep. at 88, 96, 139, 141, 145-46; Weston Aff. ¶ 5.) Contrary to Vanamatic's argument here, the Willis/Weston Sales Representative Agreement supports this testimony. When Paragraphs 4.A and 4.C are read together, it is apparent that Vanamatic paid Willis commissions on existing business contracts and/or purchase orders as well as reorders of existing contracts, orders under open contracts, as well as orders of existing parts with minor modifications. (Def.'s Ex. A.) That Willis and Weston agreed in their separate agreement to limit post-termination commissions to the initial term of a particular contract or purchase order does not speak to the post-termination commission agreement between Willis and Vanamatic or Weston and Vanamatic. (*Id.*)

Weston also testified that it was the industry standard to pay commissions "for the life of the part." (Weston Dep. at 89-91.) As support for this statement, Weston relies on (1) information gained from the Society of Manufacturer's Representatives that this practice exists to protect manufacturer's representatives in the event they are fired after bringing in business for a client (Weston Dep. at 90-91); (2) other sales representative agreements that Weston negotiated and entered into with other companies (*id.* at 65-66, 71, 94-95); (3)

4

personal knowledge that another sales representative, Harry Blackworth, is currently receiving commissions "for the life of the part" (*id.* at 98-99); and (4) personal knowledge that other sales representatives have similar agreements for post-termination commissions (*id.* at 99).

It is not disputed that for about eight years, beginning in the latter part of 1998, Vanamatic would negotiate with Weston and attempt to reduce their agreement to writing. (Weston Dep. 172-74, 179, 183-208.) Vanamatic's President, James Wiltsie, Jr., conceded that one primary objective of these negotiations was to get Weston to agree in writing to limit his right to post-termination commissions to one year. (Wiltsie Dep. at 74-75; Weston Dep. at 88-89, 179.)  Vanamatic acknowledges that Weston's initial position at each negotiation was that he was entitled to commissions "for the life of the part." (Def.'s Mot. at 3.)  A September 20, 1999 proposed agreement from Weston supports this assertion. (Pl.'s Ex E, 9/20/99 Independent Sales Agent Agreement at ¶6(b) providing that Weston would be paid commissions equal to 5% "of net sales revenues derived from sales of production parts to Schedule Customers for the life of the part. This commission rate may change per mutual agreement by both parties herein contained.").  Weston testified that, during these negotiations, he was willing to compromise and agree to a more limited time-period for post-termination commissions.  (Weston Dep. 200; Def.'s Ex. 3, 12/18/05 email from Weston to Wiltsie; Def.'s Ex. 4, 12/14/06 email from Weston to Wiltsie.)  Wiltsie also admitted that, while he was negotiating with Weston in December 2006, Vanamatic was already considering terminating its relationship with Weston.  (*Id.* at 72-73.)

Despite attempts from 1998 to 2006 to do so, Vanamatic and Weston concede that they did not enter into an agreement that limited Weston's post-termination commissions.

Rather, Vanamatic terminated its oral contract with Weston on January 2, 2008, and Weston filed this lawsuit on January 16, 2008. (Weston Dep. at 116; Weston Aff. ¶ 9.)

Vanamatic continued to pay Weston sales commissions through December 31, 2008. Vanamatic argues here that it paid these post-termination commissions even though it had no obligation to do so and despite Weston's claim that it never agreed to limit post-termination commissions to a specific time period. (Def.'s Mot. at 2; Weston Aff. ¶ 11; Def.'s Reply Ex. 3, 1/22/08 email from Weston asserting that his Vanamatic accounts "have over 20 active parts that could easily stay in production for the next 5-10 years at over 3 million in sales annually.") Weston claims that he is entitled to post-termination commissions based on the parties' oral agreement and under Michigan's procuring cause doctrine.

## II.  Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). When the moving party has met its burden under rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all

justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

### III. Analysis

Vanamatic's motion for summary judgment argues that, under Michigan law, where there is no express or implied agreement on post-termination commissions, the sales representative is not entitled to any commissions beyond those that accrued before the sales representative contract was terminated. Vanamatic's argument ignores the procuring cause doctrine which is invoked "when the parties' agreement is *silent* on the issue of post-termination commissions." *Brown v. Jason Inc.*, No. 08-11446, 2009 WL 799152 (E.D. Mich. Mar. 24, 2009). *See also APJ Assoc., Inc. v. North American Philips Corp.*, 317 F.3d 610, 616 (6th Cir. 2003) ("A manufacturer's representative firm may only obtain an award as the procuring cause of post-termination sales where the written agreement is silent."); *Leger v. Image Data Serv.*, No. 221615, 2002 WL 1463555, *2 (Mich. Ct. App. July 5, 2002) (observing that the procuring cause doctrine is "a default rule for interpreting a contract that is silent regarding the intent of the parties" regarding post-termination commissions). As this Court previously observed, the procuring cause doctrine is derived from the basic principle of good faith and fair dealing that is implied in a sales commission contract. *Reed v. Kurdziel*, 89 N.W.2d 479, 483 (Mich. 1958). As the *Reed* Court explained:

> In Michigan, as well as in most jurisdictions, the agent is entitled to recover his commission whether or not he has personally concluded and completed the sale, it being sufficient if his efforts were the procuring cause of the sale. In Michigan the rule goes further to provide if the authority of the agent has been cancelled by the principal, the agent would nevertheless be permitted to recover the commission if the agent was the procuring cause.

*Id.* (internal citations omitted).

There is no evidence here that the parties intended to foreclose all post-termination commissions. In fact, Weston presents persuasive evidence to the contrary. If, as Vanamatic argues, their oral sales agreement was silent as to post-termination commissions, the procuring cause doctrine is properly invoked here. (Vanamatic Reply at 2-3 citing Weston Dep. at 88, 137-38, 140.)

Moreover, in light of the evidence presented by Weston in opposition to Vanamatic's motion, it is apparent that questions of material fact remain for trial whether Weston can be considered the procuring cause of Vanamatic sales on which commissions have not been paid. In *Roberts Assoc., Inc. v. Blazer Int'l Corp.*, 741 F. Supp. 650, 655 (E.D. Mich. 1990), the court observed that "[i]f subsequent purchase orders are submitted by a customer which involve no additional servicing or negotiation, then the salesman securing the original account may well be entitled to commissions on those sales." It further observed that "[i]t is a question of fact for the jury whether subsequent purchases were effectuated by additional customer services or were made solely on the force of the original representations [of the plaintiff sales representative]." *Id.* Although Mr. Wiltsie's Affidavit (¶¶ 7 and 9) states that all subsequent purchase orders that Vanamatic receives are "subject to negotiation" as to delivery date, price, quantity, and other factors and that "all orders" are "eventually revised or require some servicing, such as follow-up, re-pricing, improvements, quality issues, engineering changes, etc.," questions of fact remain whether Weston is still owed commissions on any purchase orders that he procured but have not yet been re-negotiated, revised, or required some servicing.

Vanamatic and Weston also dispute whether the parties intended to give Weston post-termination commissions "for the life of the part." In *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, the Sixth Circuit observed that "[l]ife of the part" commissions are apparently fairly common practice in the manufacturer's representative business." 96 F.3d 174, 176 n.1 (6th Cir. 1996). "[S]ales representatives commonly insist on 'life of the part' provisions in agency contracts because the sales representative must invest a great deal of time, effort, and money in securing an initial sale" and "after an initial sale is made, the buyer may continue to use the part in the manufacture of its automobiles for many years." *Id.* (internal quotation marks and citation omitted).

Here, Weston presents evidence that Willis told him that the Willis/Vanamatic oral agreement provided for post-termination commissions "for the life of the part," that this was the industry standard, that he had contracts with other companies providing for such commissions, that he has personal knowledge of other sales representatives that had agreements for this type of commission, and that he began his negotiations for a written agreement with Vanamatic from 1998 through 2006 from the position that he was entitled to post-termination "life of the part" commissions. Accordingly, similar to the plaintiff in *Brown*, Weston "has set forth sufficient evidence that the parties intended 'life of the part' post-termination commissions" to survive Vanamatic's motion for summary judgment. *Brown*, 2009 WL 799152 at *4.

**IV.  Conclusion**

Because there are disputed issues of material fact, i.e., those of contractual intent regarding post-termination commissions and those regarding the payment of commissions

on sales for which Weston was the procuring cause, Defendant Vanamatic's motion for summary judgment is DENIED.  *See Terry Barr Sales Agency*, 96 F.3d at 179; *Roberts Assoc.*, 741 F. Supp. at 655.

        s/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated:  June 15, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 15, 2009, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager